IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:25-CV-00517

**ANTARES REINSURANCE COMPANY LIMITED,**

        **Plaintiff,**

v.

**CLEAR BLUE INSURANCE COMPANY,**

        **Defendant.**

**COMPLAINT**

Antares Reinsurance Company Limited, formerly known as Qatar Reinsurance Company Limited ("Qatar Re," "Antares" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendant Clear Blue Insurance Company ("Clear Blue" or "Defendant"), alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

**INTRODUCTION**

This is an action for monetary damages arising from Defendant's wrongful and improper drawdown on a letter of credit. The parties entered multiple reinsurance agreements pursuant to which Plaintiff procured a letter of credit for Defendant's benefit under certain limited circumstances. Specifically, the stated purpose of the letter of credit was to secure payment from Plaintiff for its obligations pursuant to the reinsurance agreements. Despite this limited and specific purpose, Defendant unilaterally and improperly drew down on the letter of credit to satisfy an unrelated monetary dispute, wholly unconnected to any obligations under the reinsurance agreements. Defendant's drawdown was not authorized under the terms of the letter of credit and constitutes a conversion of funds to which it was not entitled. As a result, Plaintiff has been wrongfully deprived of its property.

## PARTIES

1. Plaintiff Antares is a corporation organized and existing under the laws of Bermuda with corporate offices in London, UK. Antares is a company engaged in the business of insurance and reinsurance. Therefore, Antares is a citizen of Bermuda and the United Kingdom.

2. Defendant Clear Blue is a Texas domiciled company with its U.S. headquarters in Charlotte, North Carolina and its principal place of business in the Commonwealth of Puerto Rico and in the State of North Carolina. Therefore, Clear Blue is a citizen of the State of Texas and the State of North Carolina. Defendant is also a company engaged in the business of insurance and reinsurance.

## VENUE AND JURISDICTION

3. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of North Carolina and a citizen of a different country, and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

4. Venue is proper in this judicial district because Clear Blue is subject to this Court's personal jurisdiction with respect to this action. Clear Blue has its headquarters in Charlotte, North Carolina and maintains its principal place of business in Charlotte, North Carolina.

## FACTUAL ALLEGATIONS

<u>The Quota Share Reinsurance Agreements Secured by a Letter of Credit</u>

5. Qatar reentered into two Quota Share Reinsurance Agreements ("QSAs"), pursuant to which Qatar Re was the reinsurer and Clear Blue was the cedent, effective March 21, 2016, and January 1, 2017, appended hereto as **Exhibit A** and **Exhibit B**, respectively.

6. Each QSA provides, under Article XXVII "Loss Reserves and Unearned Premiums Funding," in relevant part, that Antares will secure its obligations for:

> (a) Unearned Premiums, (b) Loss Reserves and (c) all other amounts for which [Clear Blue] cannot take credit on its statutory financial statements unless funding or acceptable collateral is provided by [Qatar Re]," by the establishment of a "clean, irrevocable and unconditional Letter of Credit to be obtained by [Qatar Re] in favor of [Clear Blue]."[1]

See **Ex. A** at Article XXVII[2] and **Ex. B** at Article XXVII.

7. The QSAs provide, in relevant part, that Clear Blue, in its sole discretion, may draw the full amount of the Letter of Credit to satisfy Qatar Re's obligations under the QSAs or if Qatar Re failed to comply with the QSAs. *See* **Ex. A** at Article XXVII, § 27.01(b) and **Ex. B** at Article XXVII, § 27.01(b).

8. The QSAs specify, in relevant part, that the parties agreed that any funding provided by Qatar Re pursuant to the QSAs may be drawn upon at any time and used by Clear Blue for the following purposes, unless otherwise provided for:

> 1. to reimburse [Clear Blue] for [Qatar Re's] obligations, the payment of which is ***due under the terms of this Agreement*** and that has not been otherwise paid; 2. to make refund of any sum that as if any December 31st is in excess of the actual

---

[1] Unearned Premiums is defined as:

> the aggregate premium attributable to the unexpired coverage period of all insurance Policies produced under the [GAA and subject to this] Agreement, as determined in accordance with generally accepted statutory accounting principles consistently applied. For this purpose, premium shall be the written premium charged on the insurance Policy for the period such Policy is in force irrespective of the subsequent billing and collection of such premium.

**Ex. A** at Article XXVII § 27.05 and **Ex. B** at Article XXVII § 27.05 (bracketed language only included in **Ex. B**).

Loss Reserves is defined as:

> (a) all reserves for unpaid losses including reserves attributable to losses incurred but not reported and losses reported but not paid with respect to the insurance policies produced under this Agreement, and shall include provision for both allocated and unallocated loss adjustment expense, in each instance as determined in accordance with generally accepted accounting principles consistently applied and (b) paid losses and/or expenses and/or any other obligation due to the Company that have not been reimbursed by the Reinsurer.

**Ex. A** at Article XXVII § 27.06 and **Ex. B** at Article XXVII § 27.06.

[2] The language in **Exhibit A** at Article XXVII slightly differs in that it provides, in pertinent part, for a "clean, irrevocable Evergreen letter of credit."

3

amount required to pay or collateralize *[Qatar Re's] obligations under this Agreement*; . . . 4. to pay [Antares'] share of any other amounts [Clear Blue] claims are *due under this Agreement*.

See **Ex. A** at Article XXVII, § 27.07 and **Ex. B** at Article XXVII, § 27.07 (emphasis added).

9. In connection with the QSAs, Qatar Re obtained Letter of Credit No. SO139238200 (the "LOC"), from Australia and New Zealand Banking Group Limited ("ANZ"), which was issued on February 23, 2018, appended hereto as **Exhibit C**. The LOC named Clear Blue as the beneficiary. Pursuant to the LOC, Clear Blue could draw up to $35,414,015.00 USD.

10. The stated purpose of the LOC was for Qatar Re to "comply with the terms and conditions of loss and unearned premium reserve funding clause in [Antares'] various reinsurance contracts with [Clear Blue]" (*i.e.*, the QSAs). See **Ex. C**, Page 2.

The XOL Contracts and the Dispute over XOL Premium

11. Separately, Clear Blue entered into several unrelated Excess Catastrophe Reinsurance Contracts (the "XOL Contracts") as a cedent with various reinsurers.

12. Antares participated on one XOL Contract that incepted on June 1, 2021, appended hereto as **Exhibit D** (the "2021 XOL Contract").

13. The premium for the 2021 XOL Contract totaled $29,374,588.75 (the "XOL Premium"). The XOL Premium was allocated between various parties to the 2021 XOL Contract.

14. Qatar Re agreed to pay, and did pay, 50% of the XOL Premium for the 2021 XOL Contract, or $14,687,294.38.

15. Clear Blue claims, however, that Qatar Re was responsible for 75% of the XOL Premium, or $22,030,941.50. Accordingly, Clear Blue and Qatar Re have a dispute regarding whether Qatar Re owes Clear Blue an additional $7,065,834.00 for XOL Premium under the 2021 XOL Contract.

16. The parties engaged in settlement discussions regarding their dispute over the amount of XOL Premium owed by Qatar Re, but were unable to reach a resolution.

17. During the discussions about the XOL Premium dispute, Clear Blue informed Qatar Re that it would draw down on the LOC to satisfy what it thought it was owed for the XOL Premium.

18. Qatar Re advised Clear Blue on multiple occasions that a draw down on the LOC to satisfy the XOL Premium dispute would be improper and contrary to the terms of the LOC and the QSA.

The Improper Drawdown on the LOC

19. On or about December 22, 2022, Clear Blue drew down on the QSA LOC in the amount of $7,065,834.00, which amount constitutes the additional 24.05% of the XOL Premium Clear Blue claims Qatar Re owes, above the 50% Qatar Re paid towards the XOL Premium (the "Drawdown").

20. With the Drawdown, Clear Blue is now in receipt of $22,030,941.50, or roughly 75% of the XOL Premium.

21. Antares disputes that it owed Clear Blue $7,065,834.00 towards the XOL Premium and maintains that it owed only the $14,687,294.38 that it already paid towards the XOL Premium.

22. In addition, Clear Blue was not entitled to draw down on the LOC for obligations under the XOL Contract. Rather, the clearly stated sole purpose of the LOC was to secure Qatar Re's obligations under the wholly unrelated QSAs. Clear Blue unilaterally drew down on the LOC to satisfy amounts it claimed it was owed in relation to the XOL Premium dispute—which was plainly outside the intended purpose of the LOC.

5

23. Thus, the Drawdown was an unauthorized use of the LOC funds both in that Clear Blue took the funds to satisfy a disputed obligation and that any such obligation was beyond the scope of the permitted purpose of the LOC.

Events Following the Drawdown

24. Shortly after the Drawdown, ANZ requested remittance from Antares for $7,065,834.00, to replenish the funds needed to secure the full amount of the LOC that had been depleted by the Drawdown. Antares remitted the full $7,065,834.00 to ANZ on January 10, 2023.

25. Antares demanded that Clear Blue return the funds improperly drawn from the QSA letter of credit; however, Clear Blue refused to return the funds.

26. Thus, Antares is out of pocket $7,065,834.00, as well as the opportunity to invest that amount from January 10, 2023 to present.

27. The parties attempted to negotiate a compromise, but to date, Clear Blue has refused to return any portion of the $7,065,834.00 Drawdown.

**FIRST CAUSE OF ACTION**
(Conversion)

28. Plaintiff hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 27 as if set forth fully herein.

29. The funds used to secure the LOC represent specific and identifiable property because it was part of a segregated fund to be used for a specifically designated purpose.

30. The funds used to secure the LOC constitute property owned by Plaintiff to which Plaintiff has now been deprived. Defendant was only a potential beneficiary of the funds used to secure the LOC if certain conditions were met, which were not met here. In particular, the funds used to secure the LOC were only to be used for Clear Blue's benefit in connection with Qatar Re's obligations under the QSAs. Outside of that limited purpose, Defendant had no right to the

property.  Because Clear Blue drew down on the LOC in connection with a disputed amount of XOL Premium, under the wholly unrelated XOL Contract, Defendant had no right to the property.

31. Defendant's Drawdown was an unauthorized, wrongful conversion, in that Defendant deprived Plaintiff of $7,065,834.00 in funds that had been specifically segregated to secure the LOC for the QSAs, but was impermissibly used to satisfy a dispute regarding the XOL Premium under the XOL Contract.  Defendant's Drawdown falls outside the intended use of the LOC and was therefore unauthorized and constitutes conversion.

32. As a result of the conversion by the Defendant, Plaintiff is entitled to receive compensatory damages for the amount of the Drawdown, plus lost income opportunity, fees, interest and other amounts to be proven at trial.

## SECOND CAUSE OF ACTION
**(Unfair and Deceptive Trade Practices)**

33. Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-32 as if fully set forth herein.

34. The global reinsurance industry operates on a high level of trust. The reinsurance obligations are secured through extensive use of letters of credit, which are used to secure the reinsurance obligations of the reinsurance carriers in the event of insolvency or inability to pay the cedent insurers for their share of losses incurred. As such, reinsurers have issued to cedent insurers various letters of credit to provide security for losses which are attributable to discrete and identifiable obligations under discrete and identifiable reinsurance agreements. At any time, a cedent insurer may have multiple letters of credit from a single insurer securing different loss obligations under different agreements.

35. Clear Blue knew that the LOC was not intended to secure any obligations pursuant to the XOL Contract, but proceeded to draw down on it despite knowing its conduct was

impermissible. During discussions between the Parties regarding the XOL Premium, Clear Blue informed Qatar Re that they identified available sources of funds—namely the LOC—to cover Qatar Re's alleged obligations for the XOL Premium and threatened to draw down on the LOC to satisfy what it thought it was owed for the XOL Premium. In response, Qatar Re informed Clear Blue on multiple occasions that the LOC was issued to secure Qatar Re's obligations under the QSA and could not be used for an attempted recovery of an alleged commercial debt unconnected to the QSA. Nevertheless, Clear Blue proceeded to draw down on the LOC despite Qatar Re's continued reminders that the Drawdown would be improper and Clear Blue's own understanding that the purpose of the LOC was to secure Qatar Re's obligations under the QSA.

36. Clear Blue, by drawing down on a letter of credit issued on behalf of Antares securing the obligations under the QSA for a separate premium dispute arising out of the XOL Contract, violated that trust.

37. If at any time a cedent, which holds various letters of credit securing reinsurance obligations, can draw down on those letters of credit for any reason, such as an unrelated business dispute, the balance of the reinsurance marketplace is upended and begins to unravel. This circumstance would grant a cedent unrestricted leverage in any routine business dispute, limited only by the aggregate value of all the letters of credit issued on behalf of the reinsurer to secure its various and distinct loss obligations.

38. North Carolina statutes prohibit such unfair and deceptive trade practices. N.C. Gen. Stat. § 75-1.1, *et.seq.*

39. Clear Blue, by drawing down on a letter of credit issued on behalf of Antares to secure its obligations under the QSA over an unrelated dispute regarding payment of premiums under the XOL Contract, engaged in an unfair and deceptive trade practice.

40. Clear Blue's unfair and deceptive drawing down of the LOC affected commerce.

41. Clear Blue's unfair and deceptive trade practices in unlawfully drawing down the LOC caused Antares damages.

42. Further, by failing to return the funds from an unlawfully drawn down letter of credit, Clear Blue compounded Antares' damages, constituting a continuous violation.

43. Therefore, Antares is entitled to recovery of damages caused by Clear Blue's unfair and deceptive trade practices, including treble damages under N.C. Gen. Stat. § 75-16 and attorney fees under N.C. Gen. Stat. §75-16.1.

## THIRD CAUSE OF ACTION
### (Declaratory Judgment)

44. Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-43 as if fully set forth herein.

45. Plaintiff claims a lawful and superior right to possess the property identified in Paragraph 29 of this Complaint.

46. Defendant committed conversion through its unauthorized and wrongful drawdown on the LOC, which deprived Plaintiff of its property. As of December 2022, Defendant asserts a competing claim or continues to exercise control over Plaintiff's property without consent.

47. There is a bona fide dispute between the Parties as to the ownership and right to possession of the property described above.

48. This Court has jurisdiction to hear Plaintiff's request for declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

49. Plaintiff requests that this Court declare the Plaintiff's rights and legal status with respect to the property identified in Paragraph 31 of this Complaint. Specifically, Plaintiff

respectfully requests that this Court declare that Defendant's Drawdown on the LOC was wrongful and that Plaintiff is entitled to reimbursement from Defendant for the amount of the Drawdown.

## PRAYER FOR RELIEF

**WHEREFORE**, upon the factual allegations and reasons set forth in this Complaint, Plaintiff respectfully prays the Court for the following relief:

1. For the entry of declaratory judgment finding that the Drawdown was wrongful and that Plaintiff is entitled to reimbursement from Defendant for the amount of the Drawdown;

2. That the Court enter judgment against the Defendant on Plaintiff's claim and award Plaintiff compensatory damages in the amount of $7,065,834.00 constituting the amount of the Drawdown;

3. That the Court enter judgment against the Defendant for investment loss, as well as interest and costs, including pre-judgment and post-judgment interest and reasonable attorneys' fees (in amounts to be proven at trial);

4. Treble damages pursuant to N.C. Gen. Stat. § 75-16; and,

5. For such other and further relief as the Court deems just and proper.

**This the 16th day of July, 2025.**

/s/**JOHN L. WRIGHT**
**John L. Wright**
**NC State Bar No. 45554**
**Hedrick Gardner Kincheloe & Garofalo, LLP**
**4201 Congress Street, Suite 300**
**Charlotte, NC 28209**
**Phone: 704-319-5436**
**Fax: 704-602-8160**
**jwright@hedrickgardner.com**
*Local Rule 83.1(d) Attorneys for Plaintiff*

**/s/ERICA J. KERSTEIN**
**Erica J. Kerstein**
**Robinson & Cole LLP**
**Chrysler East Building**
**666 Third Avenue, 20th Floor**
**New York, New York 10017**
**Phone: 212-451-2900**
[ekerstein@rc.com](mailto:ekerstein@rc.com)
*Attorneys for Plaintiff*
*Pro Hac Vice Application Forthcoming*